**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| THERESA MCKENNEY, SHIRLEY PATTERSON, AND THE NATIONAL FEDERATION OF THE BLIND, INC., | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| EXACT CARE PHARMACY, LLC. | ) ) |
| Defendant. | ) ) ) |

**CIVIL ACTION NO.**

JUDGE

MAGISTRATE JUDGE

**COMPLAINT**

**JURY DEMAND ENDORSED HEREON**

## INTRODUCTION

1.    Plaintiffs Theresa McKenney, Shirley Patterson, and the National Federation of the Blind, Inc. ("NFB"), bring this action against Exact Care Pharmacy, LLC ("Exact Care"), for denying blind individuals an equal opportunity to access their health care information, in violation of Section 504 of the Rehabilitation Act ("Section 504"), 29 U.S.C. § 794(a), Section 1557 of the Patient Protection and Affordable Care Act ("Section 1557"), 42 U.S.C. § 18116, and the common law of the State of Ohio.

2.    Section 504 and Section 1557 require Exact Care to communicate in an equally effective manner with blind individuals. Exact Care must provide auxiliary aids and services and make the modifications necessary to ensure that blind individuals have an equal opportunity to participate in and enjoy the benefits of Exact Care's programs and services. Appropriate auxiliary aids and services for blind individuals include providing documents in alternative formats, such as an audio recording, large print, Braille, and digital navigable formats supported by computers and/or digital talking-book players, transmitted through data CD, flash drive, e-mail, or other media.

3.      Exact Care deprives blind individuals of full and equal access to its medical services, programs, and activities. Exact Care provides critical communications, such as communications concerning patients' prescription medicines, the dosages of those medicines, and warnings and side effects of those medicines, only in standard print, a format inaccessible to blind individuals. When blind patients have requested accessible alternative formats, such as an audio recording or large print, Exact Care has failed, whether intentionally, recklessly, deliberately indifferently, or negligently, to provide them. This ineffective communication compromises the ability of Exact Care's patients to review their own health care information privately and independently and forces them to rely on sighted third parties for assistance. It also disrupts blind patients' access to their health care, prevents them from understanding and following medical instructions, and leads to personal hardship. Four decades after the enactment of Section 504, Exact Care has failed to, and continues to fail to, communicate effectively with blind individuals.

4.      Because Exact Care did not provide alternate formats, as required by federal law, Plaintiffs McKenney and Patterson suffered emotional distress, bodily injury, and physical pain and suffering, among other harms.

5.      For semantic convenience throughout this complaint, the term "blind" is used in the broadest sense to include all persons who, under federal civil rights laws, have a vision-related disability that requires alternative methods to access print materials.

## JURISDICTION AND VENUE

6.      The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343(a)(3)-(4), & 1367.

7.      Venue is proper in the Northern District of Ohio because a substantial part of the events, actions, or omissions giving rise to this complaint occurred in this District, and Defendant Exact Care has its primary place of business in this District. *See* 28 U.S.C. § 1391(b).

## PARTIES

8.      Plaintiff Theresa McKenney is a 72-year-old woman who is blind and does not own a computer. She accesses information auditorily, such as through audio recordings. Ms. McKenney became an Exact Care patient approximately ten years ago and remained an Exact Care patient until around April 2023. She is a qualified individual with a disability within the scope of Section 504 and Section 1557. Ms. McKenney resides in Cleveland, Ohio, and is a member of the NFB.

9.      Plaintiff Shirley Patterson is a 73-year-old woman who is blind and accesses information auditorily, such as through audio recordings. Ms. Patterson also is able to read large print if the font is sufficiently large and the document containing the large print is properly formatted for large-print users such as herself. Ms. Patterson was an Exact Care patient for over a decade but left Exact Care in or around 2021 or 2022 because Exact Care was not willing to provide her with health care information using audio recordings or large print. She is a qualified individual with a disability within the scope of Section 504 and Section 1557. Ms. Patterson resides in Cleveland, Ohio, and is a member of the NFB.

10.     Plaintiff the National Federation of the Blind, the oldest and largest national organization of blind persons, is a non-profit corporation duly organized under the laws of the District of Columbia with its principal place of business in Baltimore, Maryland. It has affiliates in all 50 states, Washington, D.C., and Puerto Rico. The vast majority of its approximately 50,000 members are blind persons who are recognized as a protected class under federal laws.

The NFB is widely recognized by the public, Congress, executive agencies of government, and the courts as a collective and representative voice on behalf of blind Americans and their families. The NFB promotes the general welfare of the blind by assisting the blind in their efforts to integrate themselves into society on terms of equality and by removing barriers that result in the denial of opportunity to blind persons in virtually every sphere of life, including education, health care, employment, family and community life, transportation, and recreation. The NFB has many members, including Plaintiffs Theresa McKenney and Shirley Patterson, who reside in Ohio and have relied on Exact Care, currently rely on Exact Care, and are expected to rely in the future on Exact Care for their pharmaceutical needs, and who seek to access their critical health care information on a private and equal basis.

11.    The ultimate purpose of the NFB is the complete integration of the blind into society on a basis of equality. This objective includes the removal of legal, economic, and social discrimination. As part of its mission and to achieve these goals, the NFB has worked actively to ensure that the blind have an equal opportunity to access information related to their health care by working with the Centers for Medicare and Medicaid to ensure provision of readily available accessible communications to blind Medicare applicants, recipients, and beneficiaries, and by partnering with private companies to provide readily available accessible health-related technology to the blind. Indeed, before filing the present lawsuit, the NFB (through counsel) wrote to Exact Care in an attempt to work collaboratively to provide accessible formats for blind patients on a systemic basis, but Exact Care merely acknowledged receipt of the letter and declined to engage in the proposed substantive discussions.

12.    Defendant Exact Care Pharmacy LLC ("Exact Care") is a national medication management and pharmacy care provider that was founded in 2009 and which serves tens of

thousands of patients each year. Exact Care's corporate headquarters and fulfillment center are located at 8333 Rockside Road, Valley View, Ohio, 44125, which is the same address to which Exact Care encourages its patients to mail their prescriptions, letters, and notes. Exact Care is a pharmacy that ships prescription medicines directly to patients' homes. Exact Care is licensed to serve patients nationwide. Exact Care receives money from the federal government, including through Medicare reimbursements.

**FACTS**

**Exact Care Pharmacy**

13.    Exact Care claims to offer patients a "simpler" and "safer" way to access their prescription medicines, especially patients who take multiple daily medications and have multiple doctors. Exact Care consolidates prescriptions from a patient's doctors and then ships a package to that patient's home—which Exact Care calls the "ExactPack"—containing a 30-day supply of that patient's medicines. The medicines are sorted by day and time when the patient should take them and placed into individual, tear-away packets connected on a roll.

14.    Each of the individual, tear-away packets in the ExactPack has instructions and/or icons printed on one side of the packet concerning the medicines therein. These print instructions and/or icons indicate the name, strength, and dosage for each medication in the packet, the day and time when the medicines in that packet should be consumed (*e.g.*, "Friday Morning"), the number of each type of pill in the packet, descriptions of each medication (which may include the color, shape, and what is printed on the pill), and the number of packets for this day and time of day (i.e., whether that packet is "1/1" or "1/2" for "Friday Morning").

15.    The information printed on each tear-away packet is intended to help patients know what medications they are taking and when. Exact Care instructs patients to look at the top

of each packet for the day, time of day, and number of packets to ensure they are taking the correct packet(s) for that day and time. If the patient takes more than eight medications at a certain time of day, the patient may have more than one packet for that time of day, because a single tear-away packet cannot hold more than eight pills. That is why a patient may have two "Friday Morning" packets, for example.

16.     The ExactPack may include other medicines, in addition to those packaged into the tear-away packets, that do not readily fit into the tear-away packets, such as creams. The ExactPack also includes a "delivery summary sheet" listing the medications shipped and other information, such as information on why medicines the patient's doctors previously prescribed, but no longer prescribe, are not in the ExactPack, as well as other patient information.

17.     Exact Care also sends a monthly bill in the mail for copayments for prescription medicines (if applicable) and for the cost of medication not covered by insurance.

**Theresa McKenney**

18.     Ms. McKenney is 72 years old and is blind. She lives alone in Cleveland, Ohio. At all relevant times for this complaint, Ms. McKenney has resided in Cleveland.

19.     Approximately ten years ago, an Exact Care representative came to a senior citizens' crochet group in which Ms. McKenney participated. The crochet group met regularly at a center that provided services for senior citizens. The crochet group was comprised of approximately five women, including Ms. McKenney, all of whom had visual impairments. Because of their visual impairments, these women met in a room at the center that was specially reserved for them in order to accommodate their needs.

20.     At the crochet group meeting, the Exact Care representative detailed Exact Care's business model and encouraged Ms. McKenney and others in the crochet group to sign up to

receive their medicines through Exact Care. The representative stated that Exact Care was superior to traditional brick-and-mortar pharmacies, including because Exact Care patients received their medicines by mail, which was more convenient, and because Exact Care patients did not have to worry about juggling various pill bottles, because Exact Care medications arrived pre-sorted in packets according to the date and time when they should be taken. The Exact Care representative also said Exact Care was as reliable as a traditional pharmacy.

21.     After hearing this presentation, Ms. McKenney decided to sign up for Exact Care. Obtaining medicines in the mail from Exact Care was convenient for Ms. McKenney. Obtaining medicines from a brick-and-mortar pharmacy is more burdensome, because it would require her to travel to the pharmacy during business hours and navigate the store, something that is difficult and likely would require someone to accompany Ms. McKenney on the trip.

22.     Ms. McKenney promptly gave the Exact Care representative her contact information. The Exact Care representative then came to Ms. McKenney's home and explained how Exact Care delivered medicines by mail, how the tear-away packets worked, and explained again why Exact Care was superior to brick-and-mortar pharmacies. At no time did Ms. McKenney review the Exact Care web site, nor was she ever directed to the web site by an Exact Care representative. At no time did Ms. McKenney ever review an Exact Care cell phone application, nor was she ever directed to such an application by an Exact Care representative.

23.     Although she had low vision when she became an Exact Care patient, Ms. McKenney lost her vision completely in 2017. Today, Ms. McKenney has no vision.

24.     In or around 2017, Ms. McKenney called Exact Care to inform Exact Care that she had lost her vision and that she needed some way to distinguish her "day" medicines from her "night" medicines. Ms. McKenney and Exact Care agreed that Exact Care would put one

rubber band around a box containing her "day" medicines and two rubber bands around the box containing "night" medicines, so that she could distinguish them.

25.    Ms. McKenney subsequently called Exact Care on the phone and told an Exact Care representative that, in addition to distinguishing between "day" and "night" medicines, she would like to be able to access information about her medicines. She further explained that technology that would enable her to do this was readily available.

26.     In particular, Ms. McKenney told the Exact Care representative that some pharmacies use ScripTalk, a text-to-speech technology that "reads" aloud to blind patients the drug name, dosage, instructions, and other information when the patient scans the prescription drug label on a "station reader." Ms. McKenney already had the "station reader" in her home, and she asked Exact Care to put the appropriate label on her medicines so that she could have the station reader "read aloud" this information to her. On the phone, the Exact Care representative was non-committal and said someone would be in touch about whether Exact Care would make such technology available. No one from Exact Care called her back.

27.    After no one from Exact Care called her back regarding her desire to access her health care information through ScripTalk or similar technology, Ms. McKenney called Exact Care a second time to follow up on her inquiry. Ms. McKenney again stated she was blind and repeated her request to access her health care information via ScripTalk or similar technology. On the phone, the Exact Care representative again was non-committal and said Exact Care would be in touch on this issue. And again, no one called her back.

28.    In her phone conversations with Exact Care representatives, Ms. McKenney explained that she wanted to use ScripTalk or similar technology to access information about her

medications because she was blind and could not read standard print. Because she is blind, she also asked Exact Care to inform her in advance if her prescriptions would change.

29.     Exact Care failed to do so. From 2017 (when she lost her sight completely) to November 2022, Ms. McKenney called Exact Care at least once more on the phone, stated that she was blind, and further stated that she was confused by the medicines Exact Care was shipping to her in the mail. Ms. McKenney told Exact Care that, although she could tell the pills in her tear-away packets had changed, she had no accessible information regarding this change and did not want to consume medicines without knowing what she was consuming. In response, Exact Care informed her that her doctors had changed her prescriptions. Exact Care also told her that her ExactPack contained print information concerning her medicines—even though Ms. McKenney, as a blind woman, was unable to access that information.

30.     In or around December 2022, Ms. McKenney called Exact Care and again stated that she was confused by the medicines Exact Care had shipped to her home. Ms. McKenney explained that the packets in her "day" medicines box seemed to contain an insufficient number of pills. In response, an Exact Care representative stated that Exact Care is only able to put a certain number of pills in each tear-away packet. Because the pills that Ms. McKenney needed to take in the morning exceeded that limit, Exact Care had spread the morning pills over two tear-away packets. Accordingly, the Exact Care representative instructed Ms. McKenney to take two packets each morning to ensure she took all her prescribed medicines.

31.     Because Exact Care had not provided information about her medicines in a way that Ms. McKenney could access independently—such as ScripTalk or similar technology, as she previously had requested—Ms. McKenney followed the instructions that Exact Care gave her over the phone and began consuming two packets of medicines each morning.

32.     In or around January 2023, Ms. McKenney began suffering from a series of adverse health conditions. These included daily and persistent headaches; shaky hands; tingling in her fingers, feet, toes, and lips; lack of balance; numbness in her hand; nausea; neck pain; and lightheadedness. Ms. McKenney had multiple consultations with her doctors in or around February and March 2023 in an attempt to determine why she suffered from these symptoms, but the cause remained unclear.

33.     In or around early April 2023, Ms. McKenney began to suspect the medicines from Exact Care were causing her adverse health conditions. She called Exact Care and asked a representative to confirm how many pills she was supposed to take each morning. This information was readily accessible, in the ExactPack, to sighted patients. Because Ms. McKenney is blind, however, she could not access this health care information on her own.

34.     The Exact Care representative informed Ms. McKenney that she should take eight pills each morning—the contents of one tear-away packet. Through this conversation, Ms. McKenney realized she had been taking twice her prescribed dosages for months.

35.     Ms. McKenney's doctor had prescribed an increased number of pills for a limited time only. However, no one at Exact Care provided accessible information to Ms. McKenney concerning her prescription medications and, in particular, how many pills she should take each morning and when she should no longer take two "morning" packets. Ms. McKenney would not have consumed double her "morning" pills if Exact Care had provided her with instructions and other information concerning her medicines in an accessible manner.

36.     After talking with Exact Care in or around April 2023, Ms. McKenney called her doctor, who advised her to go to the emergency room immediately. After performing a series of tests, an ER doctor told Ms. McKenney that she had suffered kidney damage. To this day, Ms.

McKenney continues to suffer from adverse health conditions caused by months of overdosing, including headaches, tingling and numbness in her extremities, twitching muscles, nerve pain, and lack of balance. Ms. McKenney to this day takes medications for neuropathy and nerve pain, which resulted from months of over-dosing on various medications.

37.     Ms. McKenney suffered physical harms and physical pain and suffering as a result of her overdose. For instance, overdosing on her prescription medications damaged the nerves in her feet. As a result, at nighttime Ms. McKenney's feet feel as if they have needles sticking into them, and they burn and itch. During the day, the nerve damage in her feet affects her balance, causing her to stumble and making it more likely she will fall.

38.     Despite knowing that she is blind, Exact Care for years sent Ms. McKenney inaccessible print documents.

39.     When the box containing a 30-day supply of her medicines arrived each month, it contained various documents in standard print. Upon information and belief, these documents included brochures about her medicines and bills for expenses related to her medicines. Ms. McKenney wanted to be able to access this information, but was unable to. With respect to the bills, she also could not determine, privately and independently, whether Exact Care was billing her for accurate amounts of money.

40.     With respect to bills, eventually, an Exact Care representative would call Ms. McKenney on the phone and demand payment over the phone using a credit card. Ms. McKenney would explain that, because she is blind, she cannot read her credit card information and would direct the representative to call her daughter to get her payment information and obtain payment. Her daughter would then pay on behalf of Ms. McKenney.

41.     In or around April 2023, Ms. McKenney stopped using Exact Care's services, because she had been harmed by Exact Care's failure to provide her information in formats (such as audio recordings or similar technology) that she could access independently and privately.

42.     In order to facilitate her switch to a new pharmacy, Ms. McKenney called Exact Care and, on three separate occasions, told an Exact Care representative on the phone that she was leaving and asked Exact Care to provide her with information on which medications she currently was taking. The only information Exact Care provided, however, was a blurry standard-print document, which Ms. McKenney's (sighted) daughter was unable to read.

43.     As a result, Ms. McKenney called her doctor and received her prescription-drug information from her physician. However, Ms. McKenney did not receive the information in a timely manner from Exact Care, delaying her transition to the new pharmacy. Worse, Exact Care then sent Ms. McKenney a box of medicines, even though Ms. McKenney was no longer an Exact Care patient. As a result, Ms. McKenney could not obtain her medicines for that month from her new pharmacy under Medicaid. Ms. McKenney was uncomfortable taking the medicines from Exact Care and instead went for one month without medicines.

44.     Ms. McKenney wants to review information related to her medicines privately and independently. She could do so if Exact Care provided information concerning her medicines via an audio recording or text-to-speech technology or similar technology.

45.     Ms. McKenney wants to be able to access her health care information privately and independently and on an equal basis with sighted individuals, including because she wants to be able to review which drugs she is taking as well as her prescription medications' instructions, warnings, side effects, and related information. She could do so if Exact Care provided her with alternate formats.

46.     Exact Care's failure to provide Ms. McKenney with alternative formats (such as audio recordings) that she could access privately and independently harmed Ms. McKenney.

47.     Ms. McKenney suffered and continues to suffer emotional distress from the failure of Exact Care to effectively communicate about her medications and the way she reasonably relied on its communications to her detriment.

48.     Ms. McKenney's harms also include physical pain and suffering (*e.g.*, daily persistent headaches, neck pain, nausea, tingling in her extremities, numbness, lack of balance) and physical injury and/or illness (*e.g.*, damage to her kidneys, nerve damage).

49.     In addition, Ms. McKenney was harmed because she has had to spend significant time and energy in consultations with an array of doctors concerning her physical harms and physical pain and suffering. Since around January 2023, Ms. McKenney has repeatedly met with doctors to discuss her pain and physical harms and how best to address them.

50.     Ms. McKenney also was harmed because she had an expectation interest in the ability to fully participate in her own medical care through effective communication with her pharmacy, which Exact Care denied to her. She also is entitled to damages to compensate her for the opportunities she lost when she was denied the ability to meaningfully access and participate in her health care with respect to her prescription medicines.

51.     Ms. McKenney is entitled to compensation for all losses stemming from Exact Care's failure to provide alternate formats to her, including expectation damages, lost opportunity damages, consequential damages, dignitary damages, expenses for past and future medical care, incidental damages, and nominal damages.

52.     Ms. McKenney seeks damages to the full extent allowed by law.

**Shirley Patterson**

53.     Plaintiff Shirley Patterson is 73 years old and is blind. She resides in Cleveland, Ohio. At all relevant times for this Complaint, Ms. Patterson has resided in Cleveland.

54.     Before becoming an Exact Care patient, Ms. Patterson relied on family members to retrieve her medicines from a brick-and-mortar pharmacy for her. This was inconvenient for Ms. Patterson, who wanted a way to obtain her medicines independently.

55.     Ms. Patterson first started receiving her medicines through Exact Care around 13 years ago. She became an Exact Care patient after an Exact Care representative came to an elementary school where she was working and encouraged her to join Exact Care.

56.     In particular, the Exact Care representative told Ms. Patterson that it would be far more convenient for her to receive medications by mail. The representative told her Exact Care was more efficient than a brick-and-mortar pharmacy and just as reliable.

57.     At that meeting, Ms. Patterson told the Exact Care representative that she wanted to be able to determine, on her own, if she was taking the correct medicines. Because she was visually impaired, Ms. Patterson explained to the Exact Care representative that she could not read small print on prescription pill bottles.

58.     In response, the Exact Care representative said such communication issues would not be a problem with Exact Care, because all medicines would arrive pre-packaged.

59.     After this meeting, Ms. Patterson decided to become an Exact Care patient, because delivery of her medications through the mail to her home was more convenient for her and in light of the reassurances that the Exact Care representative had given her. At no time did Ms. Patterson review the Exact Care web site, nor was she ever directed to the web site by an Exact Care representative. At no time did Ms. Patterson ever review an Exact Care cell phone application, nor was she ever directed to such an application by an Exact Care representative.

14

60.     Ms. Patterson received different medicines through Exact Care over the years, including both pills and injections (which she self-administered). Because she is blind, Ms. Patterson cannot access information or warnings about her medicines if they are written in standard print. Instead, she requires properly-formatted large print documents or information she can access auditorily, such through as ScripTalk or similar technology.

61.      While she was an Exact Care patient, Ms. Patterson called Exact Care multiple times, told an Exact Care representative she was blind, and repeatedly asked if Exact Care could provide information about her medicines in an alternate format. Ms. Patterson did so because she believed it was important that she know which medicines she was taking as well as the warnings or side effects associated with those medicines, and she wanted to be able to access this information privately and independently. She also knew her doctors sometimes changed her medicines, and she wanted to stay abreast of her latest prescriptions. Her nurses also had told her it was important for her to know which medicines she was taking.

62.     During multiple phone conversations with Exact Care representatives, Ms. Patterson asked if Exact Care could provide information about her medicines via ScripTalk or a similar technology. Each time, the Exact Care representative told her this was not possible.

63.     After Exact Care representatives refused to provide health care information via ScripTalk or similar technology, Ms. Patterson asked one Exact Care representative if, in the alternative, Exact Care could provide information about her medicines in large print, which she can access if the font is large enough and proper formatting is used. The Exact Care representative said that was not possible either.

64.     The last time Ms. Patterson asked for health care information in an accessible format, and was denied, was in or around 2021 or 2022.

65.     Although Exact Care knew Ms. Patterson was blind and needed alternative formats to access health care information, Exact Care did not establish any systems that would have enabled her to distinguish "day" pills from "night" pills. As a result, Ms. Patterson devised her own system. By feeling how many pills a packet contained, she could determine if it was a "day" or "night" packet, because the "night" packets contained fewer pills.

66.     Despite knowing she was blind, Exact Care also for years sent Ms. Patterson information in its ExactPack in standard print, including information about her medicines and warnings about her medicines. Ms. Patterson had to ask people to read this information to her.

67.     Exact Care's failure to provide alternate formats, such as audio recordings or large print, harmed Ms. Patterson. For instance, without such alternate formats, she had no way to independently and privately review the side effects and warnings associated with her medicines. As a result, Ms. Patterson did not understand (as a sighted patient would have) that her medications were causing her side effects and physical harm.

68.      With respect to her injections for arthritis, Ms. Patterson continued taking the injections that Exact Care provided even after she started suffering from shortness of breath and swollen legs filled with fluid. Initially, she mistakenly believed these symptoms were caused by her asthma. But one night she heard on the television that the injections she was taking through Exact Care can, in certain cases, harm a patient's heart. After hearing this, Ms. Patterson stopped taking the injections until she could consult with her doctor. When her doctors examined her, they diagnosed Ms. Patterson with congestive heart failure. Ms. Patterson's doctors subsequently told her she must take heart medication for the rest of her life to address her heart failure.

69.     To this day, Ms. Patterson takes medication to address her heart failure.

16

70.     The injections that Ms. Patterson received through Exact Care harmed her heart and caused and/or contributed to the diagnosis of congestive heart failure and caused and/or contributed to her shortness of breath and swelling in her legs. Upon information and belief, had Exact Care timely provided information about her medicines in an alternate format, as Ms. Patterson had requested, she would have ceased taking the injections earlier and thereby avoided some or all of the adverse health conditions she suffered.

71.     If Ms. Patterson had known the injections could harm her heart and cause her shortness of breath and leg swelling, she never would have taken them in the first place.

72.     Also while an Exact Care patient, Ms. Patterson noticed that her hair began to fall out. Because Exact Care did not provide information about her medicines in alternate formats, Ms. Patterson was forced to ask her grandchild to Google the side effects of her medications, at which time she determined that hair loss was a side effect of one of her medications. Ms. Patterson then decided to stop taking that medication.

73.     In or around mid-2022, Ms. Patterson stopped using Exact Care after Exact Care representatives again told her, on a phone call, that Exact Care would not provide information about her medicines in the accessible formats Ms. Patterson had requested.

74.     Ms. Patterson wants to access her health care information privately and independently and on an equal basis as sighted individuals. She could do so if Exact Care provided her with accessible formats.

75.     Ms. Patterson suffered and continues to suffer emotional distress from the failure of Exact Care to effectively communicate about her medications and the way she reasonably relied on its communications to her detriment.

76.     Exact Care's failure to provide Ms. Patterson with alternative formats harmed Ms. Patterson in other ways, including physical pain and suffering (*e.g.*, swollen legs) and physical injury and/or illness (*e.g.*, harms to her heart). In addition, Ms. Patterson has had to participate in many medical examinations and conversations with doctors in an effort to address her pain and suffering and her physical injury and/or illness.

77.     Ms. Patterson also was harmed because she had an expectation interest in the ability to fully participate in her own medical care through effective communication with her pharmacy, which Exact Care denied to her. She also is entitled to damages to compensate her for the opportunities she lost when she was denied the ability to meaningfully access and participate in her health care with respect to her prescription medicines.

78.     Ms. Patterson is entitled to compensation for all losses stemming from Exact Care's failure to communicate effectively with her by providing health care information in accessible formats, including expectation damages, lost opportunity damages, consequential damages, dignitary damages, expenses for past and future medical care, incidental damages, and nominal damages. Ms. Patterson seeks damages to the full extent allowed by law.

### LaTherese McKenney

79.     Exact Care provides prescription medications to many more blind Ohioans than Theresa McKenney and Shirley Patterson; currently services many blind patients; and has failed to ensure that such current blind patients have an equal opportunity to access their health care information, in violation of federal law.

80.     One such current blind patient is LaTherese McKenney ("LaTherese"), Plaintiff Theresa McKenney's daughter. LaTherese is blind, lives alone in Cleveland, does not own a computer, does not use email, and does not use cell phone applications.

81.     Due to early onset glaucoma, LaTherese is unable to read standard print. In order to access print documents, LaTherese requires large print.

82.     LaTherese has been an Exact Care patient for many years and currently still receives medicines from Exact Care. She cannot read the standard-print information on the tear-away packets she receives from Exact Care containing her prescription medicines. For instance, she cannot read the information telling her a packet is for "Friday Morning" or "Friday Afternoon" and cannot read information linking a pill description (*i.e.*, its color and shape) to a prescription drug.

83.     Being able to independently identify which packets she should take when, and which pill corresponds to which medication, is important for LaTherese. Several years ago, after LaTherese's doctor changed her daily pill regimen, Exact Care continued to send medications to her home that her doctor no longer prescribed (and which she no longer was supposed to take). Even after she called Exact Care and alerted it of this problem, Exact Care continued to send medications LaTherese no longer needed. LaTherese continues to receive three pills to treat high blood pressure even though her doctor has prescribed only one.

84.     LaTherese wants to be able to privately and independently determine which pills are which, and when she should take them, to ensure she does not take incorrect medications. That is especially so because some pills that she receives from Exact Care are only to be consumed "as needed." LaTherese is unable to identify these pills if she decides to take them.

85.     In August 2023, LaTherese's doctor told her to stop using Exact Care because of the confusion she had endured as an Exact Care patient. Her doctor told her that LaTherese needs to be able to determine which medicines she is taking and what they look like.

**CLAIMS FOR RELIEF**

**COUNT I**
**Violation of Section 504 of the Rehabilitation Act**
**(Theresa McKenney and NFB)**

86.     Plaintiffs Theresa McKenney and the NFB incorporate the allegations in the preceding paragraphs, as if fully alleged herein.

87.     Ms. McKenney and other NFB members are individuals with a disability protected by Section 504 of the Rehabilitation Act and qualified to receive health services from Exact Care. *See* 29 U.S.C. § 794(a); 45 C.F.R. § 84.3(j).

88.     Exact Care is a recipient of federal financial assistance from the Department of Health and Human Services and is subject to Section 504 of the Rehabilitation Act and its implementing regulations. *See* 29 U.S.C. § 794; 45 C.F.R. § 84.3(h).

89.     Section 504 of the Rehabilitation Act provides that no qualified individual with a disability shall be subjected to disability-based discrimination under any program or activity receiving federal financial assistance. 29 U.S.C. § 794(a).

90.     Discrimination includes failing to "[a]fford a qualified handicapped person an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others," or providing qualified handicapped persons with "an aid, benefit, or service that is not as effective as that provided to others." 45 C.F.R. § 84.4(b)(1)(ii)-(iii); *see* 45 C.F.R. § 84.52(a)(2)-(3).

91.      Section 504 requires health programs or activities that receive federal financial assistance and that have at least fifteen employees to provide auxiliary aids and services, such as audio recordings, text-to-speech technology, and large print, to individuals who are blind. 45 C.F.R. § 84.52(b), (d). Upon information and belief, Exact Care has over fifteen employees.

20

92.     A recipient may not directly or through contractual, licensing, or other arrangements, discriminate on the basis of disability. 45 C.F.R. § 84.4(b)(1).

93.     Exact Care's provision of health care constitutes a program or activity receiving federal financial assistance, and, as a recipient, it is required to ensure that it complies with Section 504 of the Rehabilitation Act.

94.     Exact Care has failed and is failing to meet its obligation to provide blind individuals an equal opportunity to use and benefit from its health care programs and activities. In failing to provide blind patients like Ms. McKenney and Ms. Patterson with accessible formats such as audio recordings, text-to-speech technology, and large print, Exact Care has refused to provide the auxiliary aids and services necessary to communicate with blind patients in an equally effective and timely manner that protects their privacy and independence.

95.     Examples of Exact Care's inaccessible communications concerning patients' medicines include, but are not limited to, communications concerning drug names, dosages, warnings, instructions (including when to take the drugs), information concerning how many pills should be taken during the day and at night, pill descriptions, and side effects. In its ExactPack, Exact Care delivers this information in standard print to its patients.

96.     Because Ms. McKenney, Ms. Patterson, and other NFB members cannot independently access standard print, they must either find and rely on third-party assistance, which intrudes upon the privacy of their personal medical and financial information, or forego accessing their critical health care information altogether.

97.     Exact Care's failure to communicate effectively with blind patients puts their health at risk, as evidenced by the experiences of Ms. McKenney. It also increases the likelihood their blind patients will not understand the side effects of their medicines and will suffer other

21

harms, including many consultations with doctors (to address symptoms or understand their medications).

98.     Accessible formats such as audio recordings, text-to-speech technology, and large print constitute auxiliary aids and services under the Section 504 regulations. 45 C.F.R. § 84.52(d)(3). Numerous commercial entities, including pharmacies, already provide health care and other information to blind persons in similar accessible formats.

99.     As a result of Exact Care's actions and omissions, Ms. McKenney and other NFB members who are Exact Care patients or will become its patients have suffered and will continue to suffer irreparable harm: they have suffered and continue to suffer from discrimination and unequal access to Exact Care's health care services. If there is no change in the status quo, blind patients will be denied their right to access and engage fully in the provision of their health care, including with respect to their prescription medications.

100.    Exact Care's failure to meet its obligations to communicate with blind patients in an effective manner constitutes an ongoing and continuous violation of Section 504 and its implementing regulations. Unless restrained from doing so, Exact Care will continue to violate Section 504. Unless enjoined, Exact Care's conduct will continue to inflict injuries for which blind patients have no adequate remedy at law.

101.    Exact Care's refusal to communicate with blind patients in an equally effective manner, through the provision of alternative formats, was done intentionally or with deliberate indifference to the protected rights of Ms. McKenney and other NFB members. For example, even after counsel for Plaintiffs wrote to Exact Care, informed Exact Care that it was violating Section 504, among other laws, by failing to provide accessible formats for blind patients, and

offered to work collaboratively to fix the problem, Exact Care declined to offer a substantive response and declined to work collaboratively to fix the problem.

102.    With respect to Ms. McKenney, Exact Care was deliberately indifferent because it knew that Ms. McKenney was blind and knew that she could not read standard print. Nonetheless, and notwithstanding her repeated requests for alternate formats, Exact Care declined to provide them, thereby ensuring that Ms. McKenney could not access information about her medicines privately and independently, as she wanted to do.

103.    Plaintiffs are entitled to injunctive relief, as well as reasonable attorneys' fees and costs. Ms. McKenney is also entitled to compensatory damages.

**COUNT II**
**Violation of Section 1557 of the Patient Protection and Affordable Care Act**
**(Theresa McKenney, Shirley Patterson, NFB)**

104.    Plaintiffs incorporate the allegations in the preceding paragraphs, as if fully alleged herein.

105.    Ms. McKenney, Ms. Patterson, and other NFB members are individuals with a disability protected by Section 1557 of the Affordable Care Act. *See* 45 C.F.R. § 92.4.

106.    Exact Care is a covered entity operating health programs or activities that receive federal financial assistance. *See* 45 C.F.R. § 92.4.

107.    Section 1557 of the Patient Protection and Affordable Care Act prohibits discrimination on the basis of disability in any health program or activity, any part of which receives federal financial assistance, including credits, subsidies, or health insurance contracts. 42 U.S.C. § 18116; 29 U.S.C. § 794. The nondiscrimination standards under Section 1557 are at least as stringent as the standards under Section 504 of the Rehabilitation Act. 45 C.F.R. § 92.3.

108. Discrimination includes failure by a covered entity to take appropriate steps to ensure communications with participants with disabilities are as effective as communications with participants without disabilities, including failure to furnish appropriate auxiliary aids and services when necessary to afford an equal opportunity to participate in the services and activities of the entity. 45 C.F.R. § 92.202; 28 C.F.R. § 35.160. For the communications to be effective, auxiliary aids and services must be provided in accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability. 28 C.F.R. § 35.160. Covered entities must give primary consideration to the requests of individuals with disabilities when considering what types of auxiliary aids and services are necessary. *Id.*

109. Auxiliary aids and services include qualified readers; taped texts; audio recordings; Braille materials and displays; screen reader software; magnification software; optical readers; secondary auditory programs; large print materials; accessible electronic and information technology; or other effective methods of making visually delivered materials available to individuals who are blind or have low vision. 45 C.F.R. § 92.4.

110. Each covered entity must take appropriate initial and continuing steps to notify members of the public that it provides appropriate auxiliary aids and services, including information in alternate formats, free of charge and in a timely manner and how the public can obtain appropriate aids and services from the entity. 45 C.F.R. § 92.8(a).

111. Exact Care has failed and is failing to meet its obligation to notify blind individuals of how they can obtain information in alternative formats. Exact Care repeatedly misinformed Ms. McKenney and Ms. Patterson about their right to obtain information in audio recordings, text-to-speech technology, and large print and failed to disseminate information to

24

Ms. McKenney and Ms. Patterson about auxiliary aids and services during phone calls with them regarding their desire to access health care information in alternate formats.

112.    Exact Care has failed and is failing to meet its obligation to provide blind individuals an equal opportunity to use and benefit from their health care programs and activities. In failing to provide blind patients like Ms. McKenney and Ms. Patterson with accessible formats such as audio recordings, text-to-speech technology, and large print, Exact Care has refused to provide the auxiliary aids and services necessary to communicate with blind patients in an equally effective and timely manner that protects their privacy and independence.

113.    Examples of Exact Care's inaccessible communications concerning patients' medicines include, but are not limited to, communications concerning drug names, dosages, instructions (including when to take the drugs), warnings, information concerning how many pills should be taken during the day and at night, pill descriptions, and side effects. In its ExactPack, Exact Care delivers this information in standard print to its patients.

114.    Because Ms. McKenney, Ms. Patterson, and other NFB members cannot independently access standard print, they must either find and rely on third-party assistance, which intrudes upon the privacy of their personal medical and financial information, or forego accessing their critical health care information altogether. Exact Care's failure to communicate in an equally effective manner with blind patients puts their health at risk, as evidenced by the experiences of Ms. McKenney and Ms. Patterson.

115.    Accessible formats such as audio recordings, text-to-speech technology, and large print are auxiliary aids and services under the Section 1557 regulations. 45 C.F.R. § 92.4. Numerous commercial entities, including pharmacies, already provide health care and other information to blind persons in similar accessible formats.

116.    As a result of Exact Care's actions and omissions, Ms. McKenney, Ms. Patterson, and other NFB members who are Exact Care customers or will become its customers have suffered and will continue to suffer irreparable harm: they have suffered and continue to suffer from discrimination and unequal access to Exact Care's health care services. If there is no change in the status quo, blind customers will be denied their right to access and engage fully in the provision of their health care, including with respect to their prescription medications.

117.    Exact Care's failure to meet its obligations to communicate with blind patients in an effective manner constitutes an ongoing and continuous violation of Section 1557 and its implementing regulations. Unless restrained from doing so, Exact Care will continue to violate Section 1557. Unless enjoined, Exact Care's conduct will continue to inflict injuries for which blind customers have no adequate remedy at law.

118.    Exact Care's refusal to communicate with blind patients in an equally effective manner, through the provision of alternative formats, was done intentionally or with deliberate indifference to the protected rights of Ms. McKenney, Ms. Patterson, and other NFB members. For example, even after counsel for Plaintiffs wrote to Exact Care, informed Exact Care that it was violating Section 504, among other laws, by failing to provide accessible formats for blind patients, and offered to work collaboratively to fix the problem, Exact Care declined to offer a substantive response and declined to work collaboratively to fix the problem.

119.    With respect to Ms. McKenney and Ms. Patterson, Exact Care was deliberately indifferent because it knew that Ms. McKenney and Ms. Patterson were blind and knew that they could not read standard print. Nonetheless, and notwithstanding their repeated requests for alternate formats, Exact Care declined to provide them, thereby ensuring Ms. McKenney and

Ms. Patterson could not access information about their medicines privately and independently, as they wanted to do.

120.     Plaintiffs are entitled to injunctive relief, as well as reasonable attorneys' fees and costs. Ms. McKenney and Ms. Patterson are also entitled to compensatory damages.

**COUNT III**
**Negligence**
**(Theresa McKenney, Shirley Patterson, NFB)**

121.     Plaintiffs incorporate the allegations in the preceding paragraphs, as if fully alleged herein.

122.     Because Exact Care solicited Ms. McKenney and Ms. Patterson to use it as their pharmacy, knowing that they were blind and could not access printed or computer materials equally to sighted customers and purposely encouraging them to rely on Exact Care for information and services customarily provided by pharmacies and touted to be more effectively provided by Exact Care, Exact Care owed Plaintiffs a duty to accurately communicate information regarding their prescription medications, including information concerning which medicines Plaintiffs should take and when Plaintiffs should take those medicines.

123.     In light of statutory and regulatory requirements and the prevailing standard of care and practices of pharmacies, Exact Care had a duty to communicate information regarding their prescription medications in an alternate format that Plaintiffs could access, as Plaintiffs had requested. The medical harms that Plaintiffs suffered—including Ms. McKenney's headaches and nerve damage and kidney damage and Ms. Patterson's harms to her heart, hair loss, and swollen legs—were a foreseeable consequence of Exact Care's failure to provide medical information to Plaintiffs in an alternate format.

124.    Alternative formats that provide medical information to blind customers are readily available and have been effectively and efficiently used by other pharmacies, and, regardless of any obligation by doctors to provide such information, pharmacies provide that information as a matter of course, know that customers rely upon that information and packaging consistent with it, and are responsible for ensuring that blind customers receive the information and packaging in a manner they can effectively access.

125.    Exact Care recklessly disregarded its duty. Despite knowing she is blind, Exact Care failed to inform Ms. McKenney (in an accessible format) when her prescriptions changed, causing her to overdose on her prescription medicines. Similarly, despite knowing she is blind, Exact Care failed to inform Ms. Patterson (in an accessible format) of the warnings and side effects of her prescription medications, needlessly endangering her health and depriving her of the right to make decisions regarding her own health care.

126.    Exact Care's actions and omissions were the proximate cause of harms suffered by Ms. McKenney and Ms. Patterson, including harms to their health and/or aggravation of health conditions.

127.    Plaintiffs are entitled to compensatory damages.

**WHEREFORE**, Plaintiffs respectfully request that the Court grant the following relief:

1.    Declare that Defendant's failure to ensure that it offers and provides information and other communications in accessible formats to blind individuals violates Section 504, Section 1557, and the common law of the State of Ohio;

2.    Declare that Defendant has a duty to provide equally effective access to all information it and its contractors provide to patients and patient representatives, including, but

28

not limited to, communications concerning drug names, dosages, instructions (including when to take the drugs), information concerning how many pills should be taken during the day and at night, pill descriptions, and side effects, in appropriately secure formats that are accessible to blind individuals, such as Braille, large print, audio CD, and digital navigable formats supported by computers and/or digital talking-book players, transmitted through data CD, flash drive, e-mail, or other requested media;

3.      Grant a permanent injunction, requiring Defendant, its successors, agents, assigns, representatives, employees, and all persons acting in concert therewith, to develop and implement a comprehensive accessibility policy, including broad public notice and effective compliance monitoring of their contractors, to provide equally effective access to all information that Exact Care and its contractors provide to patients and patient representatives, including, but not limited to, communications concerning drug names, dosages, instructions (including when to take the drugs), information concerning how many pills should be taken during the day and at night, pill descriptions, and side effects, in appropriately secure formats that are accessible to blind individuals, such as Braille, large print, audio CD, and digital navigable formats supported by computers and/or digital talking-book players, transmitted through data CD, flash drive, e-mail, or other requested media;

4.      Award compensatory damages to Ms. McKenney and Ms. Patterson;

5.      Award damages to the full extent allowed by law, including damages for physical pain and suffering, physical injury and/or illness, medical expenses, expectation-interest damages, lost-opportunity damages, consequential damages, dignitary damages, incidental damages, nominal damages, and all other damages stemming from the denial of equal access and the failure to ensure effective communication;

6.      Award Plaintiffs' reasonable attorneys' fees and costs, as provided by law; and

7.      Order such other and further relief as the Court deems just and proper.


Respectfully submitted,


By: */s/ John S. Marshall*
John S. Marshall (0015160)
*(jmarshall@marshallforman.com)*
Helen M. Robinson (0097070)
*(hrobinson@marshallforman.com)*
Edward R. Forman (0076651)
*(eforman@marshallforman.com)*
Samuel M. Schlein (0092194)
*(sschlein@marshallforman.com)*
Madeline J. Rettig (0098816)
*(mrettig@marshallforman.com)*
MARSHALL FORMAN & SCHLEIN LLC
250 Civic Center Dr., Suite 480
Columbus, Ohio 43215-5296
(614) 463-9790
Fax (614) 463-9780

**OF COUNSEL:**
Louis A. Jacobs (002101)
(*LAJOhio@aol.com*)
177 19th St., Apt. 9C
Oakland, CA 94612
(614) 203-1255
Fax (510) 250-9007


/s/ Sharon Krevor-Weisbaum
Sharon Krevor-Weisbaum
James O. Strawbridge
Brown, Goldstein & Levy, LLP
120 E. Baltimore Street, Suite 2500
Baltimore, MD 21202
Tel: 410-962-1030
Fax: 410-385-0869
skw@browngold.com
jstrawbridge@browngold.com
Motion for Admittance *Pro Hac Vice* forthcoming

*Attorneys for Plaintiffs*

## **JURY DEMAND**

Plaintiff requests a trial by a jury of eight (8) persons.


By____*/s/ John S. Marshall*
        John S. Marshall (0015160)